CENTRAL POWER AND LIGHT COMPANY, Appellant,

v.

DEL MAR CONSERVATION DISTRICT, Appellee.

No. 16229.

Court of Civil Appeals of Texas, San Antonio.

Jan. 16, 1980.

Rehearing Denied Feb. 13, 1980.

W. N. Woolsey, J. F. McKibben, Jr., Dyer & Redford, Corpus Christi, for appellant.

George P. Kazen, Mann, Freed, Kazen & Hansen, Laredo, for appellee.

OPINION

KLINGEMAN, Justice.

This is a suit by appellee, Del Mar Conservation District (Del Mar) against appellant, Central Power and Light Company (CP&L) to require CP&L to pay to Del Mar two per cent of the gross receipts on electrical services furnished to all customers within the boundaries of Del Mar and to charge electrical rates to its customers within the Del Mar District identical to those within the City of Laredo. The trial court filed extensive findings of fact and conclusions of law.[1]

CP&L asserts thirty points of error which fall into the following general categories: (1) points of error pertaining to jurisdiction of the trial court; (2) points of error pertaining to the Statute of Frauds; (3) points of error pertaining to lack of consideration; (4) points of error pertaining to alleged violations of the Public Utilities Regulatory Act; and (5) points of error asserting that the trial court erred (a) in making certain findings of fact and conclusions of law, and (b) failing to make other findings of fact and conclusions of law.

CP&L asserts that the central dispute is whether the subject matter of this litigation is within the primary jurisdiction of the Public Utility Commission of Texas (PUC), and whether a payment of the two per cent gross receipts to Del Mar is presently legal and proper. Del Mar does not basically disagree as to this contention, but asserts that the controlling questions to be answered by this court are: (1) Did the trial court have jurisdiction to hear this suit? (2) Was the contract unenforceable because of the Statute of Frauds? (3) Was there sufficient consideration to support the contract? and (4) Is the contract rendered unenforcea-

ble because of the enactment of Tex.Rev. Civ.Stat.Ann. art. 1446c (Vernon 1978) (Public Utility Regulatory Act).

CP&L is a public utility company in the business of providing electricity to the public in various locations in the State of Texas including the City of Laredo and the Del Mar Conservation District. Del Mar was created by the Legislature in 1959 as a water control and conservation district, and in 1975 it was duly converted to a municipal utility district. It is a governmental body and political subdivision of the State of Texas. It encompasses approximately 2,100 acres in an area generally north of the City of Laredo, but basically surrounded by the City of Laredo. The area contains approximately 800 homes with a population of approximately 2,200 people. It contains an industrial park, schools (both public and private), a fire station, and certain governmental offices. In addition to the residences in such area there are also commercial businesses. CP&L's power plant for such area is located in the City of Laredo, but is so situated that its transmission lines from the power plant to many of its customers must cross through a part of the Del Mar area.

In the Fall of 1960, an agreement was entered into between CP&L and Del Mar under which CP&L was to pay to Del Mar two per cent of the gross receipts collected for electricity sold within the district and was also to charge the same rates to its utility customers within the district as were charged within the City of Laredo. Del Mar contends and the trial court found that this was done by CP&L in order to obtain an exclusive right to furnish electricity to the district and that as additional consideration CP&L would be granted the use of the streets, alleys, and other public places within the district for distribution and sale of its electrical services throughout the district. CP&L disputes some of these findings. Subsequent to this agreement, for many

---

1. The Findings of Fact and Conclusions of Law are discussed under the applicable points of error.

years CP&L regularly paid Del Mar the two per cent of such gross receipts and charged its utility customers within the district the same rates as were charged within the City of Laredo. The trial court found that pursuant to such agreement CP&L has used the streets, alleys, and other public places within the district for such purposes and Del Mar has maintained such areas for use by CP&L from 1960 down to the present date. This is disputed by CP&L. The Public Utility Regulatory Act was passed in 1975 and gives the Public Utility Commission (PUC) broad powers over the regulation of utility rates and services, effective after September 1, 1976. CP&L applied for a rate increase from all municipalities within its service area and also for an increase of rates in rural areas. The PUC entered an order in the early part of 1977 approving certain rates and tariffs. Thereafter, on March 1, 1977, CP&L notified Del Mar it would no longer pay it the two per cent of gross receipts, and, further, that it would charge rates to its customers within the district as set by the Commission's order (rural rates) which were in excess of the rates charged in the City of Laredo. Sometime thereafter, Del Mar ceased to pay CP&L for the electricity furnished for street lights and began depositing money in the registry of the 49th District Court of Webb County, Texas, for this purpose during the pendency of this suit.

## JURISDICTION

■ Our initial consideration is whether the trial court had jurisdiction over this case. CP&L contends that this dispute is over electric rates and service which are within the primary and exclusive jurisdiction of the Public Utility Commission of Texas. They assert that the trial court did not have jurisdiction to hear this case and that the trial court erred in not granting its plea to the jurisdiction and dismissing the suit. In support thereof, they argue that the law is, that not only where all the issues are within the exclusive jurisdiction of the agency, but also where some parts of the case are within the exclusive jurisdiction of the agency, the doctrine of primary jurisdic-

tion requires that the agency not be bypassed. Relief is to be sought initially by suit before the agency and such remedy exhausted before a party may resort to the courts. In support of this contention they cite *Foree v. Crown Central Petroleum Corporation*, 431 S.W.2d 312, 316 (Tex.1968); *Public Utility Commission v. City of Corpus Christi*, 555 S.W.2d 509, 512 (Tex.Civ.App.—Waco 1977), *writ ref'd n. r. e. per curiam*, 569 S.W.2d 494 (Tex.1978); *City of Corpus Christi v. Stowe*, 338 S.W.2d 767, 769 (Tex. Civ.App.—San Antonio 1960, no writ); and other similar cases. They ask this court to dismiss this cause due to lack of jurisdiction of the subject matter in the district court.

Del Mar contends that the trial court had jurisdiction to hear this case for the following reasons: (1) it is a case involving a breach of contract and not the setting of rates; (2) CP&L's contention as to lack of jurisdiction has been considered by the PUC and it rejected the precise jurisdictional argument made by CP&L in this case; and (3) there is nothing in the law that prohibits CP&L from honoring its contract.

A review of pertinent factual background in this connection reveals that by letter dated March 1, 1977, CP&L advised Del Mar it was terminating its long standing policy of charging city rates to customers in the Del Mar area and was terminating such policy as to payment of two per cent of the gross receipts on the sale of electricity in the Del Mar area. The reasons given were that PUC required the charging of rural rates rather than city rates and also that the payment of the two per cent of gross receipts was a preference contrary to the provisions of the Public Utility Regulatory Act. Thereafter, the Del Mar Conservation District ceased to pay utility bills charged by CP&L that involved street light services, but began depositing money in the registry of the 49th District Court in Webb County. A temporary restraining order was entered restraining CP&L from disconnecting the street light services which were involved. Shortly after the dispute first arose, CP&L filed a petition in the PUC stating that Del Mar had failed to pay its utility bill and

requesting Commission approval to discontinue street light services in the district.[2] This matter was considered by the Commission in its docket number 630. An examiner's report was approved on December 13, 1977, and adopted by the Commission on January 17, 1978. The examiner's report specifically addressed the question of whether or not PUC was divested of jurisdiction since the dispute was already pending in the 49th District Court. The Commission concluded that it did have jurisdiction to decide whether Del Mar was delinquent in its account with CP&L and that thereafter service could be terminated. However, with respect to the question of the two per cent of gross receipt payments, the Commission made this finding:

> Secondly, Del Mar contends that the pending litigation over the gross receipts payments would divest the Commission of jurisdiction since the entire matter is before a district court. However, the primary question in that litigation is the contractual obligation of CP&L to pay to Del Mar two percent of its gross receipts within the district's boundaries, not whether CP&L has the right under the Commission's rules to terminate service for nonpayment of a bill. In the Examiner's opinion the issue of the gross receipts payment is very clearly outside this Commission's jurisdiction, but the question of CP&L's compliance with Commission Rule 052.02.04.044 (d)1, dealing with discontinuance of service, is a matter which can properly be decided by the Commission. The two issues are essentially different questions and can be decided in different forums.

It is seen that PUC has already held that the dispute with respect to continuation of the payment of the two per cent gross receipts was properly to be decided by the District Court and not the Commission. Del Mar did not ask the district court to set utility rates but to require that CP&L honor its long standing contractual agreement.

One part of that agreement was that the rates to be charged in the Del Mar Conservation District area would be the same rates charged in the City of Laredo, whatever those rates would be. The Amended Final Order in Docket No. 91 of PUC is the order relied on by CP&L as the ultimate rate fixing order allegedly being violated. This order generally provides for rates and any increase in rates, but contains the provision: ". . . if such revenue (including the cost of fuel) cannot be collected from such contract customers, because of some self-imposed impediment, the deficit shall be borne by the company in order that there be no discrimination between customers because of favoritism in rates." Such order required CP&L to assume prior self-imposed impediments without alteration of established rates. The judgment of the district court so provides.

The trial court did not err in holding that it had jurisdiction over the case here involved.

## STATUTE OF FRAUDS AND LACK OF CONSIDERATION

By a number of points of error, CP&L urges that the trial court erred in finding there was a binding contract between the parties because (a) any agreement between the parties was unenforceable under the provisions of the Statute of Frauds; and (b) there was no consideration to support the contract.

By counterpoints Del Mar asserts that the agreement made between the parties is not within the Statute of Frauds because: (1)(a) there was sufficient written memoranda signed by the parties or duly authorized agents to satisfy the statute, (b) there was sufficient part performance to take the contract out of the Statute of Frauds; and (2) there was ample consideration for the agreement which CP&L is estopped to deny at this time.

These points will be considered and discussed together.

The trial court made certain findings of fact which are pertinent to these points of error, all of which are sufficiently sup-

---

2. Ultimately, Del Mar paid the utility bills involved in about April of 1978.

ported by the record and which may be summarized as follows:

7. During the year 1960, Central Power and Light Company and Medina Electric Cooperative were vying for the right to furnish electrical services to the then developing Del Mar Conservation District.

8. In order to obtain the exclusive right to furnish electrical service in the area, Central Power and Light Company proposed to pay to Del Mar Conservation District two (2%) percent of its gross receipts from the sale of electrical services within the boundaries of the Del Mar Conservation District. As additional consideration, Defendant would be granted the use of the streets, alleys and public places within the District for distribution, transmission and sale of its electrical services throughout the District. The term of this offer by Central Power and Light Company was for and so long as it furnished and sold electrical services in the Del Mar Conservation District.

9. Del Mar Conservation District accepted the offer of Central Power and Light Company and rejected the offer of Medina Electric Cooperative, excluding Medina Electric Cooperative from the District.

10. Central Power and Light Company, in connection with sale of its electrical services in the Del Mar Conservation District, has used the streets, alleys and public places of the District for its transmission facilities and equipment and the District has maintained such areas for use by Central Power and Light Company. This use by Central Power and Light Company and maintenance by the District has existed since the year 1960 down to the present time.

11. As the Del Mar Conservation District grew in population, some of the citizens urged the expansion of the street light network in the District. After various meetings between the citizens and the parties here involved, CP&L proposed a formal plan for a substantial expansion of the street light network. Thereafter, Del Mar spent substantial sums of money in connection with the installation of such street lights and paid an increased obligation to CP&L for such street lights.

12. In reliance on such proposals and representations by Central Power and Light Company, the District approved of and authorized the implementation of the expanded street light network, thereby obligating itself to substantially increase burdens of payment to Central Power and Light Company of its charges for such street lights, which increased obligation is continuing through the present time.

13. As a further part of the 1960 Agreement, Defendant, Central Power and Light Company, agreed to charge all customers of its electrical services within Plaintiff's District, the identical rates as currently charged to its customers within the City of Laredo. This arrangement was to continue for and so long as Defendant furnished electrical services in the area.

14. The foregoing agreements in the year 1960 and the supplement thereto in the year 1972 were made by duly authorized representatives of Central Power and Light Company and of the Del Mar Conservation District and written memorandums of each of said agreements were prepared by duly authorized representatives of Central Power and Light Company and furnished to and accepted by the Del Mar Conservation District.

15. Other written memoranda were exchanged between officers and agents of Defendant company, confirming the foregoing agreement and discussing the mechanics of implementing same.

16. Pursuant to the agreement of 1960, the Defendant commenced to furnish electrical services to Plaintiff and to customers residing within Plaintiff District and has done so continuously to the present time. Medina Electric Cooperative never furnished any electrical services in the area. Defendant also commenced to construct its power transmission facilities along and across streets and alleys and public places of Plaintiff, as

well as across private lands of Robert W. Trautmann. Mr. Trautmann was the original President of Plaintiff District and a member of the original Board of Directors and was the person who negotiated the agreement of 1960 on behalf of the Plaintiff. His agreement to allow Defendant to use his land for its transmission facilities was done on behalf of the Plaintiff and as part of the implementation of the 1960 Agreement.

17. In further compliance with the Agreement of 1960, Defendant, on or about December 16, 1960, sent to Plaintiff its check representing 2% of the gross receipts derived by Defendant from sale of electrical service in Plaintiff District for the prior six (6) months. Thereafter, a similar check was sent by Defendant to Plaintiff every six months without interruption until Defendant's check dated May 23, 1977, representing 2% of the gross receipts from sale of electrical services for the five (5) months ending February 28, 1977. Each and every check (during such period) sent by Defendant to Plaintiff contained a legend reciting that such payment to Plaintiff was for the Defendant's use of the streets, alleys and public places within the limits of Plaintiff.

*Statute of Frauds*

Written memoranda relied on by Del Mar may be summarized as follows:

(1) A letter dated September 20, 1960, on letterhead of CP&L signed by Carlton C. Whitworth with a notation thereon, "Del Mar Water District," addressed to Mr. Bates, Mr. Gilliam and Mr. Goslin, and stating in part:

You will recall at our last meeting with Robert Trautmann and Ross Jennings in Corpus Christi that the following commitments were made: (1) City rates to apply in the area. (2) City lights furnished on same basis as to the City of Laredo. (3) A two percent of our gross revenues to be paid to the water district on all electric accounts within the district. I feel we are ex-

tremely fortunate in saving this area from MEC and cutting them off at this location north of Laredo. On what date shall the two percent payment to Del Mar Water District begin? . .

(2) A letter dated November 18, 1960, on CP&L's letterhead signed by an attorney for CP&L stating: "We are obligated to pay the Del Mar Conservation District two (2) percent of the gross receipts from the sale of electricity for use within the limits of said District. . . ."

(3) A follow-up letter dated November 21, 1960, on letterhead of CP&L signed by H. P. Tyrrasch asking for certain information in connection with the billing and payment of the two per cent gross receipts to the District.

(4) A letter dated December 15, 1960, from F. R. Lane, Assistant Auditor of CP&L, addressed to Del Mar Conservation District, with a notation thereon "to pay rental for using the streets, alleys and public places within the limits of Del Mar Conservation District, on the basis of two percent (2%) of the gross receipts from the sale of electric service in and for use in the limits of said District, we report that such gross receipts and rental at two percent (2%) thereof for the six (6) months ending September 30, 1960, . ." setting forth applicable figures.

(5) Numerous copies of remittals to Del Mar with somewhat similar notations thereon.

Mr. Carlton C. Whitworth testified in some detail. Mr. Whitworth was District Sales Manager for CP&L for the Laredo District at the time of the 1960 agreement, and at the time of the trial he identified Plaintiff's Exhibit No. 1 as a memo signed by him dated September 20, 1960, confirming the details of the agreement reached between CP&L and Del Mar. He identified Mr. Bates as President of CP&L, Mr. Gilliam as Vice President in charge of operations, and Mr. Goslin as another Vice President. Mr. Whitworth then identified Plaintiff's Exhibit No. 2 as the memo from Jim Wilson, attorney for CP&L, to H. P. Tyr-

rasch, who was the home accountant for CP&L. The letter opens with this statement: "We are obligated to pay to Del Mar Conservation District two (2) percent of the gross receipts from the sale of electricity in and for use within the limits of said District." He made further identification of other exhibits identifying the parties involved, including checks forwarded by CP&L to Del Mar with the legend reciting that the check is given as payment for use of the streets, alleys and public places.

Mr. Trautmann, one of the original developers of Del Mar, also testified in considerable detail. He testified that pursuant to the 1960 agreement he personally conveyed extensive easement rights to CP&L without any payment thereof.

The pertinent portions of the Tex.Bus. & Com.Code Ann. § 26.01 (Vernon 1968) (Statute of Frauds) provides: [3]

(a) A promise or agreement described in Subsection (b) of this section is not enforceable unless the promise or agreement, or a memorandum of it, is

(1) in writing; and

(2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him.

(b) Subsection (a) of this section applies to

.    .    .    .    .

(6) an agreement which is not to be performed within one year from the date of making the agreement .  . .

CP&L cites and relies heavily on a recent Supreme Court decision in *Cohen v. McCutchin*, 565 S.W.2d 230 (Tex.1978), which discusses the Statute of Frauds and in connection therewith states:

This statute requires that, with respect to the agreements defined therein, there must be a written memorandum which is complete within itself in every material detail, and which contains all of the essential elements of the agreement, so that the contract can be ascertained from the writings without resorting to oral testimony. *Wilson v. Fisher*, 144 Tex. 53, 188 S.W.2d 150 (1945); *Boddy v. Gray*, 497 S.W.2d 600 (Tex.Civ.App.—Amarillo 1973, writ ref'd); *Walker Avenue Realty Co. v. Alaskan Fur Co.*, 131 S.W.2d 196 (Tex.Civ.App.—Galveston 1939, writ ref'd).

565 S.W.2d at 232.

However, in that case reliance was made on letter agreements which were apparently written by the McCutchins assignors, but which were neither signed by McKnight, the other party to the agreement, nor written on his letterhead and did not identify McKnight in any way. The court held that these memoranda did not identify McKnight as a party to such letter agreements sued on and were insufficient to satisfy the requirements of the Statute of Frauds. This problem is not involved in the case before us, since the memoranda relied on in this case all clearly identify the parties to the agreement.

The written evidence that is required by the statute need not be comprised in a single document, the requirement may be satisfied by two or more scripts in combination—for instance, letters passing between the parties or telegrams. A letter or telegram sufficient as to contents and signatures to constitute a memorandum satisfying the Statute of Frauds, or a part of such memorandum if more than one writing is involved, is adequate for this purpose, even though it is not intended for, addressed, delivered, or known to the other

3.  The original Texas Statute of Frauds, Tex. Rev.Civ.Stat. 1911, art. 3965, was repealed effective September 1, 1967, and replaced by the Texas Business and Commerce Code provisions. The pertinent part of the old statute reads as follows: "No action shall be brought in any court in any of the following cases, unless the promise or agreement upon which said action shall be brought or some memorandum thereof, shall be in writing and signed by the party to be charged therewith or by some person by him thereunto lawfully authorized . . . (5) [u]pon any agreement which is not to be performed within the space of one year from the making thereof."

contracting party. *Taggart v. Crews*, 521 S.W.2d 703 (Tex.Civ.App.—San Antonio 1975, writ ref'd n. r. e.); *Street v. Johnson*, 96 S.W.2d 427 (Tex.Civ.App.—Amarillo 1936, no writ).

■ A memorandum is required by the Statute of Frauds, not for the purpose of obtaining a contract in writing, but merely to furnish written evidence, signed by the party to be charged, of the obligation to be enforced against him. Therefore, a valid memorandum of the contract may consist of letters and telegrams signed by the party to be charged and addressed to his agent or the other party to the contract, or even to a third party not connected with the transaction. *Adams v. Abbott*, 151 Tex. 601, 254 S.W.2d 78 (1952); *Taggart v. Crews, supra.*

■ The documents hereinbefore discussed clearly set forth the obligations to CP&L, the party to be charged, and the parties to the agreement are clearly identified. We have concluded there was sufficient writing to remove the agreement from the Statutes of Frauds.

With regard to the question of whether there was such partial performance as to take the contract out of the Statute of Frauds, there is evidence that as the result of such agreement: (a) valuable easements were granted free of charge to CP&L; (b) Del Mar operated and maintained streets, alleys and other easements for use by CP&L; and (c) substantial other benefits were received by CP&L as a result of such agreement.

■ Notwithstanding the Statute of Frauds, an oral contract which has been partially performed may be enforced in equity if denial of enforcement would amount to a "virtual fraud" in the sense that the party acting in reliance on the contract has suffered a substantial detriment, for which he had no adequate remedy, and the other party, if permitted to plead the statute, would reap an unearned benefit. *Matthewson v. Fluhman*, 41 S.W.2d 204, 206 (Tex. Com.App.1931, judgment adopted); *Texas Co. v. Burkett*, 117 Tex. 16, 296 S.W. 273 (1927); *Morris v. Gaines*, 82 Tex. 255, 17

S.W. 538 (1891); *Davis v. Campbell*, 524 S.W.2d 790, 793 (Tex.Civ.App.—Dallas 1975, no writ).

■ The trial court did not err in concluding that: (a) the agreement between the parties was not subject to the Statute of Frauds and (b) if the agreement was subject to the Statute of Frauds, it was removed from the statute by part performance on behalf of both parties and by written memorandum of the agreement signed by the representatives of CP&L.

*Lack of Consideration*

■ CP&L asserts there was no binding contract between the parties because of a total lack of consideration. They assert that: (a) it was not possible for Del Mar to grant CP&L an exclusive franchise to the area here involved because at all times customers had full and legal right to select service from Medina Electric Cooperative; and (b) Del Mar could not grant CP&L the right to use the streets, alleys and easements within the District because Del Mar did not own such streets, alleys and easements.

We have concluded that there is ample consideration for the agreement and CP&L is estopped to deny such consideration for the following reasons:

(1) CP&L and Medina Electric Cooperative were actively competing to service the area involved and both parties made practically identical propositions to Del Mar;

(2) The acceptance of CP&L's proposal effectively cut out Medina and there is ample testimony that CP&L acknowledged that it had such effect and was of great value to CP&L;

(3) Valuable easements were conveyed to CP&L as a result of such agreements;

(4) There is testimony that (a) Del Mar conveyed to CP&L an easement to install transmission lines across land owned by Del Mar without charge as a result of such agreement and in return for the two per cent gross receipts; (b) The Del Mar District has control over and maintenance

of streets, alleys and easements used by CP&L which benefit CP&L; (c) Del Mar, after various meetings between the parties concerned, agreed to install additional street lights, which they did, and as a result thereof CP&L received increased revenue from charges for such street lights; (d) CP&L, while applying for increased rates for electrical charges in the Del Mar area from the PUC, listed among its expenses which justified such rate increase, the two per cent gross receipts payments made by CP&L to Del Mar over a period of years;

(5) CP&L continues to this day to retain the advantages and benefits from the agreement.

■ A party may not accept the beneficial part of a transaction and repudiate the disadvantageous part. "One who retains benefits under a transaction cannot avoid its obligations, and is estopped to take a position inconsistent therewith." 22 Tex. Jur.2d, *Estoppel*, § 11 (1961).

In *Boiles v. City of Abilene*, 276 S.W.2d 922 (Tex.Civ.App.—Eastland 1955, writ ref'd), the court stated:

The City cannot be compelled to use the easements. It may at any time repudiate the contracts and abandon them but so long as it chooses to use the easements it must also abide by the terms of the contracts and deliver water to appellants at the rate specified therein. The City in good conscience should not be permitted to reap the benefits of the contracts and at the same time refuse to pay the consideration therefor. The City 'cannot have its cake and eat it, too.'

276 S.W.2d at 924. See also *Guadalupe-Blanco River Authority v. City of San Antonio*, 145 Tex. 611, 624, 200 S.W.2d 989, 997 (1947), where the court noted that a city may not cancel one part of a transaction without surrendering the entire consideration received by it and restoring the status quo.

Under the record there is sufficient consideration to support the agreement here involved.

## PUBLIC UTILITY REGULATORY ACT

CP&L also contends that the trial court erred: a) in requiring the payment of a rebate because the same is prohibited by the Public Utility Regulatory Act; and b) in setting rates to be charged Del Mar because the court's setting of rates constituted a collateral attack on a valid rate order of the PUC.

The trial court made the following findings of fact and conclusions of law pertinent to this contention:

### Findings of Fact

. . . . .

19. That Paragraph F of the Public Utility Commission Order entered January 24, 1977, granting rate increases to Defendant, provides as follows:

That the percentage increase calculated in B above shall be applied to contract, as well as non-contract customers and if such revenue (including the cost of fuel) cannot be collected from such contract customers, because of some self-imposed impediment, the deficit shall be borne by the company in order that there be no discrimination between customers because of favoritism in rates.

. . . . .

### Conclusions of Law

. . . . .

5. Section 46, Article 1446c, Vernon's Annotated Texas Statutes, does not abrogate pre-existing contractual arrangements, such as the 1960 Agreement between the parties.

6. That the order of the Public Utility Commission, as amended in Docket No. 91, establishing rates for Defendant, Central Power and Light Company, expressly made establishment of such rates subject to all prior impediments of Defendant, Central Power and Light Company, which impediments included the 1960 Agreement between Plaintiff and Defendant. Such order required that Defendant assume any such prior agreements without alteration of such established rates.

7. That such 1960 Agreement between Plaintiff and Defendant is enforceable by Plaintiff, and Defendant is obligated to pay to Plaintiff 2% of the gross receipts from sale of electrical services from February 28, 1977, for and so long as it furnishes electrical services to customers within boundaries of Plaintiff. Further, Defendant is obligated to charge the identical rates to customers within boundaries of Plaintiff as it charges to customers within the city limits of Laredo, Texas, subject only to the power of the State of Texas and its agencies to modify application of such rates, which power is inherently reserved to the State of Texas under the Texas Constitution. This application of rates between Defendant and Plaintiff is a separate and severable obligation between Defendant and Plaintiff, by reason of reservation of the superior power of the State of Texas over private agreement between the parties, so that if application of such rates is altered or modified by the State of Texas or its regulatory agencies, such modification would not affect principal obligation of Defendant to Plaintiff to pay such 2% gross receipts for use of its streets, alleys and public places, for and so long as electrical services are furnished to the District by Defendant, the latter being the exercise of proprietary functions which were and continued to be within the powers of the contracting parties.

CP&L contends that the trial court's order required it to charge, demand and collect a less compensation from its customers that reside within the Water District area than is required to be collected under the rates and tariffs on file with PUC and as such is contrary to law. It further contends that the suit constituted a collateral attack on valid orders of the Commission contrary to law.

Sections 45 and 46 of the Public Utility Regulatory Act read as follows:

Sec. 45. No public utility may, as to rates or services, make or grant any unreasonable preference or advantage to any corporation or ·person within any classification, or subject any corporation or person within any classification to any unreasonable prejudice or disadvantage. No public utility may establish and maintain any unreasonable differences as to rates of service either as between localities or as between classes of service. Sec. 46. No public utility may, directly or indirectly, by any device whatsoever or in any manner, charge, demand, collect, or receive from any person a greater or less compensation for any service rendered or to be rendered by the utility than that described in the schedule of rates of the public utility applicable thereto when filed in the manner provided in this Act, nor may any person knowingly receive or accept any service from a public utility for a compensation greater or less than that prescribed in the schedules, provided that all rates being charged and collected by a public utility upon the effective date of this Act may be continued until schedules are filed. . . .

Del Mar asserts that it is a governmental body originally created as a conservation and water district and subsequently converted to a municipal utility district in 1975; that Sections 45 and 46 by its terms apply only to "persons" and "corporations" and that municipal corporations are specifically excluded from the provisions thereof; that a water supply district like Del Mar is a "quasi-municipal corporation" and is not a "person" or "corporation" within the purview of the statute; that Del Mar is a political subdivision of the state performing governmental functions and standing on the same footing as counties and other political subdivisions established by law; and that Sections 45 and 46 are inapplicable.

■ Although we have found no cases directly in point on this matter, we have concluded that the trial court correctly held that (1) Section 46 does not abrogate pre-existing contractual agreements such as the 1960 agreement between the parties; (2) under such contractual agreement CP&L is subject to the following obligations for so long as it continues to furnish service to Del Mar (a) to pay to Del Mar two per cent of

the gross receipts from the sale of electrical service in the district, and (b) to charge the identical rates to customers within the boundaries of the district as it charges to customers within the city limits of Laredo; (3) the order of PUC as amended in Docket No. 91 establishing rates for CP&L especially made establishment of rates subject to any prior impediments of CP&L which included the obligations and impediments above; (4) such order requires CP&L to assume prior contractual obligations without alteration of such established rates; and (5) if the carrying out of such obligations causes any loss of income or revenue to CP&L, the loss is to be borne by CP&L.

## POINTS OF ERROR PERTAINING TO FINDINGS OF FACT AND CONCLUSIONS OF LAW

By a number of points of error CP&L asserts that the trial court erred in making certain findings of fact and conclusions of law, and in refusing to make other requested findings of fact and conclusions of law. We have considered all of CP&L's points of error in this regard and have examined all of the findings made by the trial court and also the requested findings which the trial court refused to make. The findings of fact made by the trial court have heretofore been discussed and we have concluded that the findings of fact and conclusions of law made by the trial court fully and adequately cover all ultimate and controlling issues in the case. Additional findings requested by CP&L either do not relate to ultimate or controlling issues or conflict with original findings and conclusions made by the trial court. The findings of fact the trial court made are sufficiently supported by the record. We find no reversible error of the trial court with regard to the findings made by it or with regard to the court's refusal to make additional findings.

We have concluded that: (1) the trial court had jurisdiction over the dispute here involved; (2) the agreement here involved is not unenforceable because of the Statute of Frauds; (3) there was ample consideration for such agreement; (4) the payment of the two per cent gross receipts involved is not prohibited by the Public Regulatory Act; (5) the findings of fact made by the trial court are sufficiently supported by the record; and (6) the trial court did not err in making the findings of fact and conclusions of law filed by it or in refusing to make additional findings of fact or conclusions of law.

All of CP&L's points of error have been considered and all are overruled. The judgment of the trial court is affirmed.